IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEIGH LYNNE EPPS, | ) | CASE NO.  3:20-CV-01813-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Ashleigh Epps ("Plaintiff" or "Epps"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

On June 15, 2016, Epps filed applications for POD, DIB, and SSI, alleging a disability onset date of May 31, 2011 and claiming she was disabled due to narcolepsy, severe cataplexy, and migraines.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

(Transcript ("Tr.") 32, 187, 198.)  The applications were denied initially and upon reconsideration, and Epps requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 32.)

On October 25, 2018, an ALJ held a hearing, during which Epps, represented by counsel, her mother, and an impartial vocational expert ("VE") testified.  (*Id.*)  On July 1, 2019, the ALJ issued a written decision finding Epps was not disabled.  (*Id.* at 32-46.)  The ALJ's decision became final on June 23, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On August 14, 2020, Epps filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14-15.) Epps asserts the following assignments of error:

(1)  The ALJ's conduct over both of Epps' hearings demonstrated a prejudgment and bias toward Epps which impacted her assessment of this case.

(2)  The ALJ's reasons for affording little weight to the multiple medical opinions of Dr. Hany Jacob, MD, a treating specialist, were not supported by substantial evidence.

(Doc. No. 12 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Epps was born in November 1986 and was 31 years-old at the time of her administrative hearing (Tr. 32, 45), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English. (Tr. 45.)  She has past relevant work as a Fast Food Crew Member and Fast Food Manager.  (*Id.* at 44.)

### B.  Medical Evidence[2]

On February 20, 2013, Epps went to the St. Vincent Mercy Emergency Center with complaints of weakness, an inability to move, and being upset because people keep waking her up and she was "just so

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

tired." (*Id.* at 1142-43.)  Upon arrival, Epps was asleep on a stretcher and had to be sternal rubbed to be woken up.  (*Id.* at 1143.)  Upon awakening, Epps "continuously" cried, asked for her mother, and repeated that she did not know why she was there.  (*Id.*)  On examination, treatment providers noted Epps was anxious and appeared depressed.  (*Id.* at 1144.)  Epps' mother reported that Epps had been sleeping a lot and had been depressed since suffering a miscarriage in June.  (*Id.* at 1145.)  Treatment providers noted Epps had seen her primary care doctor for generalized weakness and depression the day before.  (*Id.* at 1146.)  Epps' mother called EMS after Epps had another "'spell' of weakness."  (*Id.*)

On August 31, 2015, when she was 24 weeks pregnant, Epps returned to St. Vincent Hospital Emergency Center after suffering from a syncopal event at work the past two days.  (*Id.* at 1150.)  Epps reported that when she stands up and starts walking, she gets lightheaded, dizzy, and the room starts to go black.  (*Id.*)  She had to lay down to keep from passing out.  (*Id.*)  Epps reported this has happened before and her primary care doctor had no diagnosis.  (*Id.*)  Epps stated this happens more when she is pregnant. (*Id.* at 1151.)  Treatment providers noted, "She gives a history consistent with neuro cardiogenic syncope and has had negative workups in the past."  (*Id.*)  An EKG was normal.  (*Id.* at 1152.)  Treatment providers diagnosed Epps with near syncope.  (*Id.* at 594.)

On September 2, 2015, Epps saw Ahmed J. Janjua, M.D., for "pseudoseizures."  (*Id.* at 855.)  Dr. Janjua noted Epps reported seizures and had a history of anemia and febrile seizures as a child.  (*Id.*)  On examination, Dr. Janjua found Epps made good eye contact, demonstrated a "clearly euthymic" mood and affect except when talking about her job, and demonstrated "adequate and normal" attention and concentration, abstraction, fund of knowledge, insight, judgment, and cognition.  (*Id.* at 855-56.)  Dr. Janjua diagnosed Epps with adjustment disorder and contagious conversion disorder.  (*Id.* at 856.)

That same day, Epps also saw Ted E. Barber, M.D., for a neurology consultation for evaluation of syncope versus seizures.  (*Id.* at 977.)  Epps had been sent from her doctor's office to the hospital after she

developed left-sided jerking while in bathroom before becoming unresponsive. (*Id.*) Dr. Barber noted Epps had received Ativan and Keppra and had since began a maintenance dose of Keppra. (*Id.*) Epps complained of nausea and vomiting. (*Id.*) Her physical examination was normal, and Dr. Barber did not offer any diagnoses other than noting that Epps had a "history of seizures." (*Id.* at 977-78.)

On April 21, 2016, Epps saw primary care doctor Michael Neverauskas, D.O., for her seizures and syncope. (*Id.* at 667.) Epps reported symptoms that began with a headache, then problems with trying to speak, slurring her words, becoming drowsy, and then falling asleep. (*Id.*) Epps wondered if she had narcolepsy and stated she also had "catatonic states." (*Id.*) Epps reported being told she had pseudoseizures. (*Id.*) Dr. Neverauskaus diagnosed Epps with seizures, headache, and obstructive sleep apnea, and referred Epps to neurologist David Syzmanski. (*Id.* at 669.)

On May 31, 2016, Epps saw Dr. Syzmanski for evaluation of her seizures and headaches. (*Id.* at 676.) Epps described having seizure spells despite being on Keppra, which she had stopped taking because it did not work. (*Id.*) Epps described getting a headache, being confused, blinking her eyes, and shaking during her seizures. (*Id.*) When the headache stopped, the seizure stopped. (*Id.*) Dr. Szymanski diagnosed Epps with nonintractable generalized idiopathic epilepsy without status epilectus and noted Epps had already undergone an MRI and EEG. (*Id.* at 677.) Dr. Szymanski recommended an anticonvulsive and started Epps on Trileptal. (*Id.*)

On June 2, 2016, Epps saw Dr. Hany Jacob upon referral from Dr. Neverauskas. (*Id.* at 1096.) Epps reported being diagnosed with pseudoseizure disorder and complained of excessive daytime sleepiness. (*Id.*) Epps told Dr. Jacob she had spent 10 days in the hospital and was told treatment providers did not find any seizures but started her on seizure medication just in case. (*Id.*) Dr. Jacob stated, "This patient has typical narcolepsy with cataplexy symptomology." (*Id.*) Dr. Jacob noted Epps had symptoms of sleep paralysis as well. (*Id.*) Dr. Jacob further noted, "As a matter [of] fact, mostly

4

because she was excited to hear her diagnosis, she developed an acute episode of sleep paralysis and cataplexy in the office.  It took her about 20 minutes to recover and she heard all the conversation and all the comments that were sent [sic] during her 'sleep paralysis episode.'"  (*Id.*)  Dr. Jacob diagnosed Epps with narcolepsy and scheduled Epps for a sleep study and multiple sleep latency test ("MSLT").  (*Id.* at 1099.)  Dr. Jacob did not believe Epps suffered from a seizure disorder.  (*Id.* at 1096.)

On June 4, 2016, Epps underwent a PSG study.  (*Id.* at 691.)  There was no evidence of sleep apnea, and an EKG and EEG were normal.  (*Id.* at 691-92.)  The impression from the study was possible narcolepsy, with Dan Pipoly, M.D., noting: "Please see comments under MSLT with regard to possible narcolepsy with severe EDS and witnessed sleep paralysis with several MSLT naps."  (*Id.* at 692.)

On June 5, 2016, Epps underwent an MLST study.  (*Id.* at 680.)  The study consisted of four naps with a mean sleep latency of 6.6 minutes.  (*Id.*)  Dr. Pipoly stated, "The mean sleep latency judged by itself does not seem to reflect the severity of pathologic sleepiness, as the pt. fell asleep instantly in the first two naps. Technician notes that the pt. awakened from 2 naps with confusion and sleep paralysis."  (*Id.*)  Dr. Pipoly recommended as follows:

> If greater than 2 naps of sleep onset REM periods (SOREMPS), and mean sleep latency of 5 or less then this can indicate Narcolepsy and drug and/or behavioral regime would be suggested.  If less than 2 SOREMPS and mean sleep latency of 5, excessively sleepy and can be idiopathic hypersomnia, then PSG and MSLT stats have to be compared.  5 and 10 mean sleep latency is a grey area and look at sleep latency of each nap to see if the naps are restorative.

> If clinical suspicion/history suggest narcolepsy, *then this MSLT would certainly support that diagnosis*, even though not diagnostic for narcolepsy.  Clinical correlation required.

(*Id.* at 681) (emphasis added).

On July 22, 2016, Epps saw Dr. Jacob for follow up.  (*Id.* at 1214.)  Epps reported "feeling weird" on 20 mg of Ritalin but after only two days of her medications she "felt significantly better," with less excessive daytime sleepiness, being more active, and not falling asleep when she got excited or angry or

5

had a change of mood.  (*Id.*)  Epps told Dr. Jacob she still had cataplexy, but it was better, and she stayed

awake during the cataplexy now.  (*Id.*)  After Dr. Jacob finished his evaluation, Epps had an episode of

sleepiness and sleep paralysis with cataplexy.  (*Id.*)  Dr. Jacob noted this episode was milder and shorter

than her previous episode in his office.  (*Id.*)  Dr. Jacob "assured [Epps] that she's getting better."  (*Id.*)

Dr. Jacob diagnosed narcolepsy and cataplexy.  (*Id.* at 1216.)

On July 26, 2016, Epps again saw Dr. Jacob for follow up.  (*Id.* at 1217.)  Epps reported doing a

little better despite still having cataplexy attacks and sleep paralysis.  (*Id.*)  However, Epps' sleep paralysis

attacks occurred much less frequently than in the past.  (*Id.*)  Epps reported her excessive daytime

sleepiness was resolved.  (*Id.*)  Epps told Dr. Jacob if she did not sleep well at night, she was more tired

during the day and then had more cataplexy attacks.  (*Id.*)  Dr. Jacob again diagnosed Epps with

narcolepsy.  (*Id.* at 1219.)

On August 11, 2016, Epps again saw Dr. Jacob for follow up.  (*Id.* at 1221.)  Epps reported doing

better, with her sleepiness almost completely improved, but she continued to experience cataplexy attacks,

albeit less severe than they were.  (*Id.*)  She still had episodes two or three times a week, although it was

down from several times a day.  (*Id.*)  Dr. Jacob advised Epps to figure out the stressors that set off her

cataplexy and avoid those situations "one way or another."  (*Id.*)  Dr. Jacob noted, "Narcolepsy clinic and

counseling is in progress.  She is now got involved [sic] with a narcolepsy/cataplexy group."  (*Id.*)  Dr.

Jacob again diagnosed Epps with narcolepsy and cataplexy.  (*Id.* at 1223.)

On August 25, 2016, Epps saw Dr. Jacob for follow up and reported negative emotions and

extreme excitement triggered her cataplexy and trying to avoid these triggers was helping her.  (*Id.* at

1224.)  Dr. Jacob noted her excessive daytime sleepiness was "probably almost under control" and that

her cataplexy was "under control especially with her cognition of the exciting factors and the triggers."

6

(*Id.*) Epps told Dr. Jacob she did not want to increase her medications as she was "happy and satisfied with the current results." (*Id.*) Dr. Jacob again diagnosed Epps with narcolepsy. (*Id.* at 1226.)

On September 15, 2016, Epps again saw Dr. Jacob for follow up. (*Id.* at 1227.) Epps reported her symptoms felt worse around her period, or when she suddenly experienced emotions. (*Id.*) Epps told Dr. Jacob she was not as sleepy as before and had more energy. (*Id.*) Dr. Jacob noted:

> She developed a cataplectic episode in the office and she was observed closely until she recovered. Overall last month evaluation appears to be the same. She does not get cataplexy episode that often and she is not sleepy like it she [sic] use [sic] to be. She has noticed some episodes of hypnagogic hallucinations. Not as frequent as would be concerning. *Again she lives 24/7 with her mom under complete observation.* She does not drive. She does not take care of her children single-handedly. She has her mom with her. . . .

(*Id.*) (emphasis added). Dr. Jacob again diagnosed Epps with narcolepsy and cataplexy. (*Id.* at 1229.)

On November 15, 2016, Epps saw Dr. Jacob for follow up. (*Id.* at 1231.) Epps reported her symptoms had improved since putting her children in daycare from 9 a.m. to 3 p.m. every day so she could nap and get some sleep. (*Id.*) While her cataplexy episodes were less, she was still getting at least one a day. (*Id.*) Dr. Jacob noted this was the first time Epps did not experience a cataplexy attack in his office and that Epps looked "more energetic and more active." (*Id.*) Dr. Jacob again diagnosed Epps with narcolepsy and cataplexy. (*Id.* at 1233.)

On December 6, 2016, Epps returned to Dr. Jacob's office and reported that during her period, her cataplexy was unpredictable and "very scattered." (*Id.* at 1235.) However, overall, her cataplexy episodes were much less, and she did not have an episode in Dr. Jacob's office that day. (*Id.*) Dr. Jacob again diagnosed Epps with narcolepsy and cataplexy. (*Id.* at 1236.)

On January 5, 2017, Epps saw Dr. Jacob for follow up and reported Xyrem was making her nauseous, but she noticed she was not having episodes in situations that would normally trigger them. (*Id.* at 1238.) Epps reported "[f]ew cataplectic episodes that are not severe and not continuous followed by excessive sleepiness as expected." (*Id.*) Epps reported being awake most of the time and more energetic.

7

(*Id.*)  Dr. Jacob noted Epps' demeanor in the office was much better.  (*Id.*)  Dr. Jacob continued Epps' medication regimen.  (*Id.*)  Dr. Jacob again diagnosed Epps with narcolepsy and cataplexy.  (*Id.* at 1240.)

On February 9, 2017, Epps saw Dr. Jacob for follow up.  (*Id.* at 1243.)  Epps reported doing well overall, although she complained of migraines that Dr. Jacob believed were unrelated to her cataplexy or narcolepsy.  (*Id.*)  Epps' diagnosis consisted of narcolepsy with cataplexy.  (*Id.* at 1245.)

On April 7, 2017, Epps saw Louis Tartaglia, M.D., after Dr. Jacob referred her for a second opinion of her narcolepsy and cataplexy.  (*Id.* at 1247.)  Dr. Tartaglia found Epps had "fairly good control" of her excessive daytime sleepiness and that her cataplexy had decreased.  (*Id.*)  However, during the appointment, Epps had an episode of weakness accompanied by a slight increase in respiratory rate and slurred speech, though her reflexes did not diminish.  (*Id.*)  Dr. Tartaglia noted that reflexes typically disappeared with cataplexy, and therefore felt that this episode was a pseudoseizure or hysterical episode. (*Id.* at 1248.)  Dr. Tartaglia diagnosed Epps as having primary narcolepsy with cataplexy and anxiety.  (*Id.* at 1247.)

On May 31, 2017, Epps saw Dr. Tartaglia on May 31, 2017 for medication management.  (*Id.* at 1250.)  Epps' diagnoses remained primary narcolepsy with cataplexy and anxiety.  (*Id.*)

On September 19, 2017, Epps saw Dr. Jacob for follow up.  (*Id.* at 1253.)  Epps reported: mild snoring; nonrestorative sleep; severe excessive daytime sleepiness; frequent awakenings; and memory, concentration, and mood deficits which were consistent with fragmented sleep.  (*Id.*)  Dr. Jacob adjusted Epps' Ritalin timing.  (*Id.* at 1255.)  Epps' diagnoses remained primary narcolepsy with cataplexy and anxiety.  (*Id.*)

On October 24, 2017, Epps saw Dr. Jacob for follow up.  (*Id.* at 1257.)  Epps told Dr. Jacob she stopped taking her Prozac because of severe mood swings.  (*Id.*)  Epps reported changing the timing of her second Ritalin dose had helped somewhat with her excessive daytime sleepiness, although Epps was

forgetting to take her Ritalin as prescribed.  (*Id.*)  Epps complained of getting very anxious and sleepy during the daytime, as well as memory, concentration, and mood deficits that Dr. Jacob noted were consistent with fragmented sleep.  (*Id.*)  Dr. Jacob referred Epps back to Dr. Tartaglia for assessment of a more appropriate medication for her anxiety than Prozac.  (*Id.* at 1259.)  Epps' diagnoses remained primary narcolepsy with cataplexy and anxiety.  (*Id.*)

On October 26, 2017, Epps saw Dr. Tartaglia for follow up.  (*Id.* at 1261.)  Epps reported irritability and mood lability most days.  (*Id.* at 1261.)  Dr. Tartaglia found Epps' symptoms sounded like rapid cycling bipolar disorder.  (*Id.*)  Dr. Tartaglia referred her to psychiatry and started her on Lamotrigine.  (*Id.* at 1262.)  Epps' diagnoses consisted of narcolepsy with cataplexy and rapid cycling bipolar disorder.  (*Id.* at 1261.)

On November 7, 2017, Epps saw Dr. Tartaglia for follow up.  (*Id.* at 1264.)  Epps reported her mood swings had diminished on the Lamotrigine.  (*Id.*)  While the medication made her a little dizzy, the dizziness had decreased "significantly" over the past seven days.  (*Id.*)  Dr. Tartaglia noted her excessive daytime sleepiness was under "very good control."  (*Id.*)  While Epps' cataplexy was also under good control, she continued to have hypnagogic and hypnopompic images.  (*Id.* at 1265.)  Epps' diagnoses remained narcolepsy, cataplexy, and rapid cycling bipolar disorder.  (*Id.* at 1264.)

On November 16, 2017, Epps saw Dr. Jacob for follow up.  (*Id.* at 1267.)  Epps reported partial control of her excessive daytime sleepiness, partial resolution of her anxiety, and doing better since her last visit.  (*Id.*)  Epps continued to complain of nonrestorative sleep, excessive daytime sleepiness, and memory, concentration, and mood deficits that were consistent with fragmented sleep.  (*Id.*)  Epps napped daily for 15 minutes and would fall asleep if sedentary, although her Epworth sleepiness score had improved.  (*Id.*)  Epps' diagnoses consisted of narcolepsy, cataplexy, and anxiety.  (*Id.* at 1269.)

On February 8, 2018, Epps again saw Dr. Jacob for follow up.  (*Id.* at 1271.)  Epps continued to experience cataplectic attacks when anxious.  (*Id.*)  Epps reported morning headaches, memory problems, concentration deficits, and falling asleep if sedentary.  (*Id.*)  Epps' diagnoses remained narcolepsy, cataplexy, and anxiety.  (*Id.* at 1273.)

On March 19, 2018, Epps saw Jenna Fitzpatrick, N.P., out of Dr. Jacob's office for completion of disability paperwork.  (*Id.* at 1276.)  Fitzpatrick noted Epps' narcolepsy and cataplexy were partially controlled.  (*Id.*)  Epps' diagnoses remained narcolepsy, cataplexy, and anxiety.  (*Id.* at 1278.)

On March 9, 2018, upon referral by Dr. Jacob, Epps saw Dia L. Arpon, M.D., for a psychiatric evaluation.  (*Id.* at 1345.)  Epps reported periods of sleep paralysis, passing out, and that strong emotions caused her to shut down and sometimes she cannot walk.  (*Id.*)  Epps also reported racing thoughts, impulsive behavior, and sometimes hearing voices.  (*Id.*)  Epps told Dr. Arpon sometimes she feels better and then does not take her medication.  (*Id.*)  Epps reported taking her medication four out of seven days, and that she felt jittery when she took her medication daily.  (*Id.*)  Dr. Arpon noted that Epps "passed out during the session when talking about emotional problems."  (*Id.* at 1346.)  On examination, Dr. Arpon found Epps had a depressed and anxious mood, labile affect, derealizations, visual hallucinations, thought content consisting of preoccupations/ruminations and paranoia, and normal insight and judgment.  (*Id.*)  Dr. Arpon diagnosed Epps with bipolar disorder, mixed, severe, with psychotic features, generalized anxiety disorder, and narcolepsy with cataplexy.  (*Id.* at 1347.)  Dr. Arpon increased Epps' Prozac and Lamictal.  (*Id.*)

On March 19, 2018, Dr. Jacob completed a Residual Functional Capacity Form.  (*Id.* at 1168-1173.)  Dr. Jacob opined that periods of excitement or changes in emotions triggered Epps' cataplexy episodes, and that these may cause "a decline in the ability to concentrate" and "loss of muscle control."  (*Id.* at 1168.)  Dr. Jacob stated the PSG and MSLT studies performed in 2016 showed narcolepsy with

cataplexy.  (*Id.*)  Dr. Jacob noted Epps continued to experience cataplexy episodes and how far she could walk, as well as her ability to reach, handle, lift, and carry, would vary depending on her cataplexy episodes.  (*Id.* at 1169-71.)  Dr. Jacob opined her cataplexy episodes may result in paralysis that could cause injuries and may cause muscle weakness that would prevent her from performing certain motions.  (*Id.* at 1170-71.)  Dr. Jacobs also stated Epps needed time to nap during the day.  (*Id.* at 1170.)

That same day, Dr. Jacob completed a Mental Residual Functional Capacity Assessment.  (*Id.* at 1174.)  Dr. Jacob noted Epps' narcolepsy with cataplexy contributed to her mental impairments.  (*Id.*)  Dr. Jacob opined that Epps' conditions resulted in marked to extreme limitations in understanding and memory and extreme limitations in sustained concentration and persistence.  (*Id.* at 1175-76.)  Dr. Jacob stated Epps' "severe episodes of cataplexy" may cause paralysis and forgetfulness, and Epps had difficulty making decisions, especially during periods of cataplexy.  (*Id.* at 1176.)  Dr. Jacob opined that Epps' impairments would substantially interfere with her ability to work on a regular and sustained basis at least 20% of the time, and that she would miss variable days of work per month due to her condition.  (*Id.*)

On April 16, 2018, Epps saw Dr. Arpon for follow up.  (*Id.* at 1349.)  Epps reported sleeping seven to eight hours a night and occasionally missing her medication.  (*Id.*)  Epps told Dr. Arpon she had passed out at her disability hearing.  (*Id.*)  Epps reported adjusting to not being able to be independent and accepting that she had an illness.  (*Id.*)  Epps described having obsessive thoughts that tended to precede a manic episode.  (*Id.*)  Epps reported obsessive thoughts, which occurred mostly prior to a manic episode.  (*Id.*)  On examination, Dr. Arpon found anhedonia, anxiety, mood swings, obsessive thoughts, paranoia, appropriate mood and affect, no pressured speech, and normal insight, judgment, attention span, and concentration.  (*Id.* at 1351.)  Dr. Arpon noted Epps "had a sleep attack when discussing the medication but was able to arouse herself after 3 minutes."  (*Id.*)  Epps' diagnoses remained bipolar disorder, mixed, severe, with psychotic features, generalized anxiety disorder, and narcolepsy with cataplexy.  (*Id.*)

11

On May 9, 2018, Epps saw Samantha Brownlee, LSW, for counseling.  (*Id.* at 1302.)  Brownlee noted that during the session Epps became anxious and experienced a cataplexy episode.  (*Id.*)  Brownlee and Epps identified triggers for Epps' anxiety.  (*Id.*)  On examination, Brownlee found anxious mood/affect.  (*Id.*)

On May 14, 2018, Epps saw Dr. Arpon for follow up.  (*Id.* at 1353.)  Epps reported medication compliance, good sleep, "pretty good" mood, fewer mood swings, and doing better emotionally.  (*Id.*)  On examination, Dr. Arpon found bright affect, improving insight, normal judgment, normal attention span, normal concentration, and no pressured speech.  (*Id.* at 1355.)  Dr. Arpon noted Epps had fewer hallucinations when falling and staying asleep.  (*Id.*)

On June 7, 2018, Epps saw Brownlee for follow up.  (*Id.* at 1304.)  While Epps was pleasant and actively participated in the session, she did become anxious and experienced another "'episode.'"  (*Id.*)  On examination, Brownlee noted anxious mood/affect, pressured speech, and continued passing out when anxious.  (*Id.*)

On June 21, 2018, Epps again saw Brownlee for follow up.  (*Id.* at 1306.)  Brownlee noted Epps demonstrated pressured speech and tangential thinking that caused Brownlee to frequently redirect Epps.  (*Id.*)  On examination, Brownlee found Epps demonstrated an anxious, labile mood, pressured speech, and tangential thought pattern.  (*Id.*)  Brownlee noted Epps cried and reported recent manic symptoms and racing thoughts.  (*Id.*)  Epps reported staying in bed or laying down and continuously watching TV.  (*Id.* at 1307.)

On July 11, 2018, Epps saw Brownlee for follow up.  (*Id.* at 1308.)  Brownlee found Epps presented with a labile mood (crying, laughing, smiling, frustration) and often needed redirection.  (*Id.*)  Brownlee noted Epps reported "'feeling weird' and experiencing one of her 'episodes,'" at which point her brother in-law joined the session to assist in reducing Epps' anxiety and stress as she "'came back.'"

(*Id.*)  On examination, Brownlee found Epps demonstrated a labile mood/affect, tangential thinking, rapid speech, and an episode of passing out.  (*Id.*)  Epps reported continuing to have episodes where she passed out and being unable to identify what triggered her episodes.  (*Id.* at 1309.)

On August 9, 2018, Epps saw Brownlee for follow up.  (*Id.* at 1310.)  Brownlee again noted she had to frequently intervene during the session as Epps' "speech would rapidly increase, her lip would tremble, and her voice would become shaky."  (*Id.*)  Brownlee asked Epps to move to the ground if she started to feel funny, and Brownlee agreed to ask Epps how she felt or if she was okay.  (*Id.*)  On examination, Brownlee found rapid speech and racing and ruminating thoughts.  (*Id.*)

On August 15, 2018, Epps saw Dr. Jacob for follow up.  (*Id.* at 1280.)  Epps reported cataplexy episodes occurring two to three times a week, but she was feeling much better that week.  (*Id.*)  Dr. Jacob noted, "her episodes of cataplexy are less and much shorter and she is running and rendering normal life, especially with the fact that her mom is taking care of the kids when she is on Xyrem at night."  (*Id.*)  Epps' diagnoses consisted of narcolepsy and cataplexy.  (*Id.* at 1282.)

On September 4, 2018, Epps saw Dr. Jacob for follow up and for completion of disability paperwork.  (*Id.* at 1284.)  Dr. Jacob noted Epps brought up "multiple issues" at this appointment.  (*Id.*)  Dr. Jacob stated Epps "has a diagnosis of narcolepsy with cataplexy and bipolar disorder."  (*Id.*)

That same day, Dr. Jacob completed another disability form regarding Epps' limitations. (*Id.* at 1289-91.)  Dr. Jacob stated Epps suffered from narcolepsy and her condition was characterized by "excessive daytime sleepiness as well as frequent episodes of sudden falling asleep and complete loss of motor control."  (*Id.* at 1289.)  Dr. Jacob indicated Epps also suffered from very frequent episodes of cataplexy.  (*Id.*)  Dr. Jacob opined Epps averaged more than 100 episodes of narcolepsy/cataplexy a month, was compliant with her medication, and had only had a partial response despite intensive treatment.  (*Id.* at 1290.)

13

On September 5, 2018, Epps again saw Brownlee for follow up.  (*Id.* at 1314.)  Brownlee noted Epps again required frequent redirection and de-escalation as Epps' speech would increase and she would report vision changes.  (*Id.*)  Brownlee led Epps through a progressive muscle relaxation exercise, which caused Epps to fall asleep and begin having behaviors similar to those within her episodes.  (*Id.*)  On examination, Brownlee found Epps demonstrated an anxious mood/affect, slurred speech when tired or having an episode, rapid speech, crying, lip trembling, and fainting.  (*Id.*)  When walking out of the appointment, Epps said her legs felt funny and she eventually fainted, although Brownlee and Epps' sister were able to get her to a chair before she collapsed.  (*Id.*)

On September 19, 2018, Epps saw Brownlee for follow up.  (*Id.* at 1316.)  Epps reported having gone to a public poetry reading and read poetry, and that she was on an "upswing."  (*Id.*)  Brownlee noted Epps presented with a labile mood and required frequent de-escalation during the session.  (*Id.*)  Epps cried during her session, and Brownlee frequently asked Epps to slow down her speech when she got elevated or excited.  (*Id.*)  Epps reported correlating poor sleep patterns with her narcolepsy episodes and continued frustration with poor memory.  (*Id.* at 1317.)  On examination, Brownlee found labile mood, broad affect, rapid speech, ruminating thoughts, crying, trembling lip, psychomotor agitation, and continued narcoleptic episodes.  (*Id.* at 1316.)

On September 26, 2018, Epps saw Dr. Arpon for follow up.  (*Id.* at 1377.)  Epps reported increased cataplexy, legs buckling when she got excited, and a recent episode where she did not feel like doing anything.  (*Id.*)  Epps told Dr. Arpon she was having difficulty distinguishing between hypnogogic hallucinations associated with her narcolepsy and real life.  (*Id.*)  Epps reported feeling exhausted from her medications and feeling frustrated.  (*Id.*)  On examination, Dr. Arpon found Epps anxious with flight of ideas, mood swings, and pressured speech, frustrated mood, bright, anxious affect, goal-directed thought

content, fluent, coherent speech, normal insight and judgment, and normal attention span and concentration.  (*Id.* at 1379.)

## C.    State Agency Reports

On August 10, 2016, William Bolz, M.D., determined Epps had no exertional limitations.  (*Id.* at 193, 204.)  She could occasionally climb ramps/stairs, but could never climb ladders, ropes, or scaffolds. (*Id.*)  Her ability to balance, stoop, kneel, crouch, and crawl was unlimited.  (*Id.*)   Epps must avoid all exposure to hazards.  (*Id.* at 194, 205.)

On December 5, 2016, on reconsideration, Robert Wysokinski, M.D., opined Epps could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 218, 230.)  Epps' ability to push and/or pull was unlimited, other than shown for lift and/or carry.  (*Id.*) Dr. Wysokinski agreed with Dr. Bolz's postural and environmental limitations.  (*Id.* at 218-19, 230-31.)

## D.    Hearing Testimony

During the October 25, 2018 hearing, Epps testified to the following:

- She lives with her mother and children in a two-story house.  (*Id.* at 113.)  Sometimes she has problems going up and down the stairs.  (*Id.*)  She is not allowed to shower. (*Id.* at 119.)  She takes a bath with a low amount of water with the door open, and her mother and sister "constantly check" on her.  (*Id.* at 120.)  She does not drive.  (*Id.* at 145.)

- She is unable to work because she is still learning her triggers.  (*Id.* at 123.)  She also has confusion and depression.  (*Id.* at 131.)  When she is depressed, she cannot do anything and that is usually when the passing out is the worst.  (*Id.*)  Her depression takes her lower with her anxiety and narcolepsy.  (*Id.* at 132.)  She sees Dr. Jacob every three months, Brownlee every other week, and Dr. Arpon every month.  (*Id.* at 124.)  She gets headaches.  (*Id.*)  Sleep alleviates the pain but trying to fight through it makes it worse.  (*Id.*)  Her medication does not help her pain.  (*Id.*)  She takes Ritalin, Lamictal, Abilify, Prozac, and Xyrem.  (*Id.* at 124-25.)  Sometimes when she wakes up, she cannot move at all.  (*Id.* at 126.)  Her body shuts down and then she is asleep again.  (*Id.*)  Her medications cause anxiety, extreme fatigue, and a burning of her tongue.  (*Id.* at 128.)

15

- She was in a wheelchair at the hearing because she felt like she was having symptoms when they arrived for the hearing.  (*Id.* at 125.)

- She tries to have a schedule.  (*Id.* at 126.)  She wakes up, then wakes up her children and feeds them breakfast.  (*Id.*)  Her mother may already be up, or she will come downstairs after.  (*Id.*)  After breakfast, she puts on an educational YouTube video for her children, then feeds them lunch.  (*Id.*)  After lunch, they all lay down for a nap.  (*Id.*)  After their nap, they may play, or she does laundry.  (*Id.*)  Sometimes she is able to take the children into the side yard and play.  (*Id.*)  Then it is time for dinner, bath, and bed.  (*Id.* at 127.)  Sometimes she goes to bed when her children do, and sometimes she goes to sleep after.  (*Id.*)  On good days, she can clean and do dishes and laundry.  (*Id.*)  Sometimes she does the grocery shopping if she is having a good day.  (*Id.*)  She sees her sister and brother in law almost every day.  (*Id.*)  She is never alone with her children.  (*Id.* at 133.)  Her entire family is trained to help her, and they rotate in and out.  (*Id.*)  Her mother is always there, and her sister and brother-in-law help, as does her 13-year-old niece.  (*Id.*)

- She passed out less after her twin children were born.  (*Id.* at 135.)  She passes out 20-25 times a week.  (*Id.* at 136.)  She already had four or five episodes that day.  (*Id.* at 137.)

The VE testified Epps had past work as a fast-food crew member and fast-food manager.  (*Id.* at 164-65.)  The ALJ then posed the following hypothetical question:

> All right, please assume a hypothetical individual of claimant's age, education, relevant vocational background.  We're going to begin with non-exertional limitations only.  She can never work at unprotected heights or around moving dangerous mechanical parts.  She can occasionally operate a motor vehicle.  She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace.  For example, no assembly line work.  She is limited to simple work-related decisions and she can respond appropriately – actually, you know what, she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently and be adequately and easily explained.  Okay, can the hypothetical individual perform any of the past jobs as actually performed or generally performed in the national economy?

(*Id.* at 165.)

The VE testified the hypothetical individual would be able to perform Epps' past work as a fast-food crew member.  (*Id.*)  The VE further testified the hypothetical individual would also be able to

16

perform other representative jobs in the economy, such as janitor, dishwasher, and hotel housekeeper. (*Id.* at 166.)

The ALJ then modified the exertional level to light. (*Id.*) The VE testified the hotel housekeeper job remained, and the hypothetical individual would also be able to work as a sales attendant and sorter. (*Id.*) The ALJ then modified the exertional level to sedentary. (*Id.* at 167.) The VE testified the hypothetical individual could work as an order clerk, polisher, and sorter. (*Id.* at 168.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she

17

suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Epps was insured on his/her alleged disability onset date, May 31, 2011, and remains insured through June 30, 2016, her date last insured ("DLI").  (Tr. 32-33.)  Therefore, in order to be entitled to POD and DIB, Epps must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2.    The claimant has not engaged in substantial gainful activity since May 31, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: history of pseudoseizures called at various times possible narcolepsy, cataplexy and non-intractable generalized idiopathic epilepsy without status epilepticus; obesity; bipolar disorder with psychotic features; and, anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

18

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404,1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can never work at unprotected heights or around moving dangerous mechanical parts and she can occasionally operate a motor vehicle.  She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work.  She is limited to simple work-related decisions.  She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently, and be adequately and easily explained.

6.  The claimant is capable of performing past relevant work as a Fast Food Crew Member DOT#311.472-010.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 35-46.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's

19

findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No.

20

11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.  Dr. Jacob's Opinions

Epps argues the ALJ failed to give good reasons for assigning Dr. Jacob's March 19, 2018 and September 4, 2018 opinions little weight.[3] (Doc. No. 12 at 23.) Epps asserts the ALJ's statements at the October 2018 hearing must be considered in reviewing the ALJ's assessment of Dr. Jacob's opinions. (*Id.*)

The Commissioner responds that the ALJ properly rejected Dr. Jacob's opinions. (Doc. No. 14 at 16.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[4] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.* "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than

---

[3] Although Epps references all three of Dr. Jacob's opinions in her brief, the focus of her argument is on the reasons the ALJ provided for discounting Dr. Jacob's two physical RFC opinions. (Doc. No. 12 at 23-24.)
[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996).[5]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[6]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[7]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as

---

[5] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

[6] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[8]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not

---

[8] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

The ALJ evaluated Dr. Jacob's opinions as follows:

> Turning to the opinion evidence, Dr. Jacobs completed a physical assessment form on March 19, 2018, stating that the claimant was unable to stand or sit for six to eight hours during the day due to episodes of cataplexy that may result in paralysis that may cause injuries (Ex. 13F). He also opined that the claimant needs to nap during the day and that she could not return to her previous employment (Ex. 13F). He completed another form dated September 4, 2018, stating that the claimant has only had a partial response to medications and that she has over 100 episodes of narcolepsy or cataplexy per month (Ex. 18F). With respect to the opinion that the claimant cannot return to her past work, the record does not show that Dr. Jacob is aware of the claimant's past employment. Further, statements that a claimant is "disabled," "unable to work," "cannot perform a past job," "meets a listing," or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Additionally, the opinions offered by Dr. Jacob are not supported by his treatment record. He stated that the claimant's limitations are due to cataplexy and otherwise states that she has over 100 episodes a month of either narcolepsy or cataplexy. These statements are wholly unsupported by the record, including his own treatment records, which document consistent improvement with near resolution of all symptoms, as discussed in detail above. Further, his opinions are not supported by objective findings. Finally, the claimant's daily level of activities, including caring for four children, including twins, all ages ten and under, does not support the degree of limitation to which

24

he opines.  Accordingly, this opinion is not supported by the record and is given little weight.

(Tr. 43.)

The Court finds the ALJ erred in her evaluation of Dr. Jacob's opinions.  None of the reasons given, without further explanation from the ALJ, suffice to support the ALJ's determination that these opinions were unsupported by and inconsistent with the record.  First, as Epps points out, while Epps' episodes of narcolepsy and cataplexy varied over time and improved with medication (Tr. 41-42), in August 2018 she reported she was still having episodes two to three times a week.  (*Id.* at 1280.)  In addition, the ALJ failed to discuss at any point in her RFC analysis the cataplexy episodes Epps continued to experience at visits with treatment providers in July and September 2018 and that Epps continued to struggle in distinguishing between real life and hypnogogic hallucinations in September 2018.   (*Id.* at 1308-09, 1314, 1377.)  Indeed, Epps experienced a narcoleptic/cataplexic episode before and during the hearing.  (*Id.* at 108, 552.)  While Epps concedes Dr. Jacob's estimate of 100 cataplectic episodes a month "appears out-of-proportion to the record" (Doc. No. 15 at 8) – although it is consistent with Epps' testimony that she experiences 25 episodes a week (Tr. 136) – that is not a reason for the ALJ to reject Dr. Jacob's consistent opinions that Epps continued to struggle with her narcolepsy and cataplexy and that her functional limitations would be impacted by those episodes.

Second, it is unclear how Dr. Jacob's opinions are unsupported by objective findings, as the record consistently documented cataplexy episodes Epps experienced in the offices of treatment providers.  (*Id.* at 1096, 1214, 1227, 1302, 1304, 1308, 1314, 1346.)  Furthermore, to the extent the ALJ relied on the 2016 sleep study as the basis for this determination, the undersigned finds the ALJ overlooked Dr. Pipoly's finding that if Epps' clinical history suggested narcolepsy, then the MSLT "would certainly support that diagnosis, even though not diagnostic for narcolepsy."  (*Id.* at 681.)  In addition, the ALJ disregarded the subsequent clinical correlation by Dr. Jacob on the basis that one of her medications had

25

been denied by the insurance company as not medically supported because the sleep study had not confirmed the diagnosis.  (*Id.* at 41.)  Moreover, the ALJ's purported reliance on the sleep study "is contradicted by the Commissioner's own Program Operations Manual System ("POMS"), a 'primary source of information used by Social Security employees to process claims for Social Security benefits.'" *Brantley v. Comm'r of Soc. Sec.*, 637 F. App'x 888, 894 (6th Cir. 2016) (citation omitted).  In discussing the evaluation of narcolepsy, the POMS specifically instructs Agency employees that cataplexy "is observed in 70 percent of all cases, and its associated presence is ordinarily sufficient to establish narcolepsy, without laboratory sleep studies."  Soc. Sec. Admin., *DI 24580.005 Evaluation of Narcolepsy*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580005 (last visited Aug. 3, 2021).

Third, it is unclear how the ALJ can rely on Epps' daily activities, including caring for her four young children, as grounds to discredit Dr. Jacob's opinion when, since 2016, Epps reported she lived with her mother and was under "complete observation" "24/7" and was never alone with her children.  (*Id.* at 1227, 133.)  While the ALJ apparently discredited Epps' and her mother's testimony at the hearing that Epps was never alone with her children, the ALJ also mischaracterized the evidence in the record that Epps was "responsible for four small children" and only "needs someone to be with her while she sleeps due to the effect of one of her medications."[9]  (Tr. 44.)

In sum, for all these reasons, the undersigned finds the ALJ failed to follow Social Security regulations and rules, as well as the law of this circuit, in evaluating Dr. Jacob's opinions.  Therefore, it is recommended the ALJ's decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

---

[9] The undersigned notes several of the ALJ's erroneous statements at the hearing, including "The bottom line is the moment someone says to her please straighten up, there's records in this file that she does" and "It's all psych" undercuts the ALJ's credibility assessment of both Epps and her mother, as the ALJ appears to misunderstand the nature of Epps' diagnoses.  (Tr. 108, 156.)

## B.  Bias

Epps argues that "there is convincing evidence here that the ALJ in this case demonstrated improper biases and prejudgment in this matter which prevented her from allowing Epps a full and fair hearing, and warranting remand to a new ALJ."  (Doc. No. 12 at 13.)

The Commissioner responds that Epps waived her bias argument by failing to raise this issue during the administrative proceedings.  (Doc. No. 14 at 12-13.)  In addition, the Commissioner argues that while the ALJ "expressed frustration" during the October 2018 hearing, "even if the ALJ's conduct of the hearing was not ideal, it still did not rise to the 'high' level needed to establish disqualifying bias."  (*Id.* at 13-14) (citation omitted).

The ALJ has "the duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel,* 530 U.S. 103, 110–111 (2000) (citing *Richardson v. Perales,* 402 U.S. 389, 400–401 (1971)).  "[T]he court must start from the presumption that administrative adjudicators are unbiased, and that honesty and integrity exist among them."  *Wells v. Apfel,* 234 F.3d 1271 (Table), 2000 WL 1562845, at *5 (6th Cir. Oct. 12, 2000) (citing *Schwiker v. McClure,* 456 U.S. 188, 195–96, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), *Navistar Intern. Transp. Corp. v. U.S. E.P.A.,* 941 F.2d 1339, 1360 (6th Cir. 1991)).  "The burden of overcoming the presumption of impartiality rests on the party making the assertion of bias, and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present."  *Collier v. Comm'r of Soc. Sec.,* 108 F. App'x 358, 364 (6th Cir. 2004) (internal citations and punctuation omitted).  "[A]ny alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference."  *Id.*  The burden to show bias is high. For instance, in *Wells,* the court found behavior that was "unbecoming a judicial officer" and "arguably discourteous" to plaintiff and her counsel was not enough to demonstrate bias. *Wells,* 234 F.3d 1271, 2000 WL 1562845, at *5; *see also Howard v. Astrue,* No. 3:09cv00179, 2010 WL 1433438, at *5

(S.D. Ohio Mar.17, 2010) (finding that the ALJ's statement to counsel, "[t]hen please shut up. Okay?," coupled with the fact that the ALJ stopped counsel's examination of plaintiff at two hearings, was not enough to show bias).

Epps argues she has preserved her claim as she is represented by new counsel before this Court, relying on *Noble v. Colvin*, Case No. 5:12-cv-329-JMH, 2013 WL 3771496, at *4 (E.D. Ky. Jul. 17, 2013).  (Doc. No. 15 at 1-2.)  In the alternative, Epps argues that the statements of counsel below in her brief to the Appeals Council that the list of errors was "not exhaustive" as the ALJ's decision contained many errors and that some of the ALJ's findings were "absurd" should be "liberally construed to imply allegations [of] bias," relying on *Fluker v. Comm'r of Soc. Sec.*, No. 12-10612, 2013 WL 1122447, at *4 (E.D. Mich. Mar. 18, 2013).  (Doc. No. 15 at 2-3).

Even assuming Epps preserved this claim for judicial review, Epps fails to "meet the high and stringent legal standard required to overcome the presumption of impartiality."  *Reighard v. Astrue*, No. 4:11CV1786, 2012 WL 1970122, at *6 (N.D. Ohio June 1, 2012).  As the Commissioner notes (Doc. No. 14 at 14), the hearing lasted almost 90 minutes and involved the testimony of three witnesses, and the ALJ held the record open for 14 days to allow Epps to submit additional records.  *See Reighard*, 2012 WL 1970122, at *6.  While the ALJ's conduct during the October 2018 hearing was "not ideal" and at times inappropriate, the ALJ's conduct fails to rise to the level of bias.  *See Wells*, 234 F.3d 1271 (Table), 2000 WL 1562845, at *5; *Liteky v. U.S.*, 510 U.S. 540, 555-56 (1994) ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women  . . . sometimes display.") (emphasis in original).

Epps asserts that the Court "retains the authority to recommend remand to a new ALJ upon its discretion" "[s]eparate from the bias claim itself."  (Doc. No. 15 at 3.)  However, as the case on which Epps relies for this proposition makes clear, courts will only intervene in the Agency's decision whether to

28

select a new ALJ after remand "if the original ALJ was biased or partial." *White v. Comm'r of Soc. Sec.*, Case No. 2:18-cv-12487, 2019 WL 2407994, at *5 (E.D. Mich. Mar. 8, 2019) (denying Plaintiff's request for a new ALJ). As explained above, that is not the case here, and the undersigned finds it inappropriate to recommend assignment to a new ALJ. Rather, as the *White* courts points out, claimants such as Epps can use 20 C.F.R. § 404.940 after remand. *Id.* (citing and quoting *Joe v. Apfel*, 1998 WL 683771, at *6 (W.D.N.Y. Jul. 10, 1998)).

In addition, Epps argues that the ALJ's misstatements at the hearing, while "wrapped up in Epps' allegations of bias," should be considered separately from the bias issue "as they raise the overall question as to whether the decision was supported by substantial evidence." (Doc. No. 15 at 4.) As the undersigned recommends remand for proper review and articulation of Dr. Jacob's opinions, on remand the ALJ will have the opportunity to consider all the record evidence in formulating the RFC.

For the foregoing reasons, the undersigned recommends the Court deny Epps' request for remand on the basis of ALJ bias.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: August 3, 2021
                                                    *s/ Jonathan Greenberg*
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**